IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


LISA COSTA <u>et al.</u>              *
                                      *
v.                                    *
                                      *    Civil Action No. WMN-09-3291
UFCW NATIONAL HEALTH &                *
WELFARE FUND                          *
                                      *
    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

**<u>MEMORANDUM</u>**

Before the Court is Defendant/Counterclaim Plaintiff's
Motion for Summary Judgment.  Paper No. 110.  The motion is
fully briefed.  Upon a review of the motion and the applicable
case law, the Court determines that no hearing is necessary,
Local Rule 105.6, and that the motion should be granted.

**I. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>**

In this action, Plaintiffs challenge a determination made
by Defendant UFCW National Health and Welfare Fund (the Fund)
that certain medical expenses incurred by Plaintiff Lisa Costa
were related to injuries sustained in a motor vehicle accident
and not to a pre-existing medical condition as Plaintiffs claim.
As explained more fully below, if the medical expenses were
related to the accident, a substantial portion of funds received
by Ms. Costa in settlement of her claims arising from that
accident would be subject to a lien, the Fund having paid those
medical expenses pursuant to a subrogation agreement.  If, on

the other hand, those expenses arise from her pre-existing injury, most of the settlement funds would not be subject to the lien.  The relevant facts are as follows.

Plaintiff Joseph Costa was employed by Diageo North America, Inc. and, as an employee, participated in a health insurance plan provided by the Fund.  The Fund is an employee benefit trust fund, and there is no dispute that its administration is governed by the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq.  Plaintiff Lisa Costa, Joseph's wife, was a beneficiary of the health insurance plan.  In July of 2003, Ms. Costa began experiencing lower back pain that radiated down her right leg.  An MRI revealed that she had a herniated disc at the L5-S1 level as well as some other spinal anomalies.  Ex. OO.[1]  The Administrative Record, however, contains no evidence of any diagnosis or treatment of her back during the next two and one half years.

That changed when on January 29, 2006, Lisa Costa was involved in a motor vehicle accident.  She was transported by ambulance to the Emergency Room of Saint Agnes Hospital where her right shoulder was x-rayed.  The x-ray showed no fractures but some mild osteoarthritic changes.  Ex. KK.  The next day,

---

[1] Defendant has filed the complete Administrative Record with exhibits designated A through KKKK.  The Court will cite the Record using those exhibit designations.

however, Ms. Costa went to see a physician complaining of muscle spasms and neck and back pain.  Ex. NN.

A few days later, on February 2, 2006, Ms. Costa went to Maryland Orthopedics for an orthopedic consultation.  The report of the consultation noted that Ms. Costa was injured in a motor vehicle accident on January 29, 2006, and also noted that she had a prior history of a herniated disc, citing the July 2003 MRI results.  Ex. TT.  Ms. Costa was prescribed a course of physical therapy, given some pain medicine, was instructed to remain on off work status and to return in a week.  Id.

Over the course of the next two years, Ms. Costa was evaluated at Maryland Orthopedics on numerous occasions. Whenever a cause of her injury is indicated, these evaluations consistently reference the January 26, 2006, motor vehicle accident.  For example, the October 2, 2006, evaluation states "the patient comes in reporting a flare up of her back condition due to her injury of January 29, 2006."  Ex. NNN (emphasis added).  The December 27, 2006, evaluation states that the impression is "multiple herniated discs of the lumbar spine and exacerbation of lumbosacral sprain and right sciatica related to the January 29, 2006 motor vehicle accident."  See Ex. OOO (emphasis added).  Both the February 19, 2007, and the May 24, 2007, evaluations state that the impression is "multiple lumbar herniated discs with moderately large herniation on the right at

L5-S1 with right sciatica and lumbosacral strain as a result of the January 29, 2006 motor vehicle accident." Exs. RRR & SSS (emphasis added). The September 13, 2007, evaluation references "persistent low back pain since her automobile accident of January 29, 2006." Ex. WWW (emphasis added). A Maryland Orthopedics evaluation completed on March 10, 2008, more than two years after the accident, still references the accident: "multiple lumbar disc herniations with right sciatica, most clinically apparent at S1" and a lumboscral strain that "are a result of the January 29, 2006 motor vehicle accident." Ex. CCCC (emphasis added).

In early 2008, Ms. Costa began to experience further exacerbation of her symptoms. In March of 2008, a neurosurgeon to whom Ms. Costa was referred, Dr. Reginald Davis, recommended surgical intervention in light of the "failed conservative measures and persistent significant symptomatology." Ex. FFFF. In making this recommendation, Dr. Davis identified the "History of the Present Illness" as her "involve[ment] in an accident in January of 2006" Id. Dr. Davis performed the surgery on May 2, 2008.

Ms. Costa submitted claims for benefits to the Fund for her medical treatment totaling $82,398.12. Those claims were paid by the Fund, but those payments were subject to a subrogation agreement signed shortly after the accident by the Costas and

the attorney representing them in matters related to the accident, Michael Green. In that subrogation agreement, the Costas and Mr. Green agreed that they would reimburse the Fund for any benefits paid should they recover any monies from third parties in connection with the accident. Ex. G. More specifically, the agreement provided in pertinent part:

> The Fund is entitled to its full lien and/or its full recovery of the total amount of benefits which are payable, regardless of the amount of monies paid or awarded to you by the third party, even if those monies are less than the full amount which you do seek or could seek against the third party, regardless of whether the monies are or are described as for medical expenses, and regardless of how they are described or what they are for, and regardless of whether full compensation from the third party is obtained or available. No reduction in the Fund's full right to recover the total amount of Fund benefits payable is effective without the Fund's written consent. The Fund retains the sole and final discretion to decide whether and in what case such consent will be granted, if requested. The Fund has a constructive trust over and an equitable right to and lien with regard to any monies received by a participant and/or his or her beneficiary, attorney or representative from a third party.

> This provision applies to any type of payment, which in any way arises from or in connection with the illness, injury, accident, occurrence, loss or condition, whether or not the payor caused or is legally responsible or liable for it. It is applicable regardless of whether such liability or responsibility is or is not denied or is in dispute.

Ex. G at ¶¶ 1, 2.[2]

---

[2] This language is identical to language contained in the Fund's Summary Plan Description (SPD). Ex. C, § XV.

The signing of this subrogation agreement was a condition of the receipt of benefits.

After Ms. Costa's surgery, Mr. Green sent demand letters to Allstate Insurance Company (Allstate), the insurer of the driver who struck Ms. Costa, and Erie Insurance Company (Erie), the insurance company that provided underinsurance coverage under Ms. Costa's automobile insurance policy. Mr. Green ultimately recovered $100,000.00 from the insurance companies, settling Ms. Costa's claim for the full limits of the two policies; $25,000.00 from Allstate, and $75,000.00 from Erie. Mr. Green relates that he had a 40% contingency agreement with the Costas and accordingly, in his view, he is entitled to $40,000.00 of that recovery.

The Fund contends that all of the medical expenses it paid were related to the accident and asserted a lien on the full $82,398.12 pursuant to the terms of the subrogation agreement. Mr. Green responded to the Fund's assertion of the lien with a letter dated October 30, 2008,[3] requesting that the Fund waive at least $76,798.74 of that amount. Ex. U. In his view, only

---

[3] The copy of the letter in the Administrative Record is dated "October 30, 2008 & January 14, 2009" and indicates that it was received on January 20, 2009. Ex. U. Mr. Green explains that, in response to a request from the Fund for additional information, he simply resent the October letter and its attachments in January. The Court assumes another copy of this letter was mailed on October 30, 2008, and Defendant does not dispute that it received the request for waiver in October 2008.

$3,519.00 of the medical expenses were related to the accident and therefore subject to the lien.  Id.  The remainder of those expenses, he asserts, relates to Ms. Costa's pre-existing degenerative disc disease.  Id.[4]

In response to the request for a reduction of the lien, the dispute was referred to the Fund's Medical Director, Norman Kupferstein.  After a review of the medical records, Dr. Kupferstein determined that the full amount of the lien was related to the accident.  The request for reduction of the lien was then submitted to the Fund's Claim Review Committee which, in turn, referred the matter to an Independent Medical Reviewer.

The Independent Medical Reviewer issued a report on March 24, 2009, and determined that all of the medical expenses were related to the accident.  The Reviewer explained:

> There is no evidence that the patient was suffering
> from similar symptoms prior to the accident.  It is
> documented many times in the medical records that her
> symptoms began after the MVA.[5]  Moreover, there is an
> MRI demonstrating mild degenerative changes (as would
> be expected at her age) in 2003.  There is a
> significant increase in the pathology seen in the MRI
> a month after the accident that correlates with her
> symptoms.  This involves a significant increase in
> disc protrusions at two levels, that could certainly
> occur after a traumatic injury.  These changes can be
> considered degenerative changes, but in light of the

---

[4] In this letter, Mr. Green reports that he has reduced his fee from 40% to 33 1/3%.  In his most recent pleading, however, Mr. Green continues to assert that his fees amount to $40,000. Opp'n at 7-8.

[5] "Motor Vehicle Accident"

recent trauma and acuity of symptoms, they are, more
likely than not, due to the motor vehicle accident.
Also, unlike degenerative changes such as a spinal
stenosis or end-plate changes, disc protrusions can
certainly occur as the result of a traumatic event.

Ex. Z.

The Claim Review Committee adopted the opinion of the
Independent Medical Reviewer and on May 8, 2009, sent to Ms.
Costa its determination that the full amount of the lien was due
to the Fund.  Mr. Green appealed that decision to the Fund's
Board of Trustees on June 19, 2009.  Ex. HH.  In addition to
reasserting that the vast majority of the medical bills were for
treatment of a pre-existing condition, Mr. Green asserted that
the Fund had failed to render a decision within 120 days of his
October 2008 request for a partial waiver of the lien as was
required under the Fund's Summary Plan Description.  Id.

On September 24, 2009, the Board of Trustees sent a letter
to Ms. Costa and Mr. Green stating that it "affirmed the Claims
Review Committee's determination that the Fund's lien amounted
to $82,398.12 based on independent medical review and opinion."
Ex. JJ.  The letter stated further, however, that "[t]he
Trustees decided that out of the $100,000 total third party
recovery, the Fund will be reimbursed 50% of its lien, or
$41,199.06, on the condition that no further benefits will be
paid by the Fund arising out of or in connection with the
accident or injury.  The Trustees' decision is without prejudice

or precedent to any other case or situation." Id.  The letter concluded with the request that a check for $41,199.06 be forwarded to the Fund.

Instead of forwarding a check, Ms. Costa filed a Complaint in the Circuit Court for Baltimore County.  In that Complaint, Ms. Costa sought a declaration that the Fund was entitled to a lien amount of only $3,689.48.  The Fund removed the action to this Court and then filed its answer along with a counterclaim. In the counterclaim, the Fund seeks the full amount of the lien, $82,398.12, pursuant to the subrogation agreement and as determined by the Claims Review Committee and affirmed by the Board of Trustees.  Because the subrogation agreement was signed by Mr. Costa and Mr. Green, in addition to Ms. Costa, the Fund named all three as Counterclaim-Defendants.

Plaintiffs then moved to dismiss the Counterclaim on the ground, inter alia, that the Board of Trustees' September 24, 2009, letter represented an agreement on the part of the Fund to waive 50% of its lien.  The Court rejected that argument and denied the motion to dismiss, observing that "the letter plainly stated in the paragraph immediately above the language relied upon by the Counterclaim Defendants that the Trustees affirmed the determination that the Fund's lien amounted to $82,398.12." June 10, 2010, Mem. & Order at 4.  Furthermore, the Court noted

that "[n]othing in the letter reveals an intention on the part of the Fund to unconditionally waive 50% of the lien." Id.

The Fund has filed a copy of the full Administrative Record and has now moved for summary judgment.  The Fund argues that, under the applicable standard for review of decisions made by employee benefit plans, the Court must defer to the Trustees' determination that the full amount of the lien is due to the fund and must enter judgment accordingly.  In responding to the motion, Plaintiffs argue that summary judgment is inappropriate as the Court should determine what equitable relief should be given under these particular facts.  Opp'n at 9.  Plaintiffs also argue that the Fund's decision was not timely rendered. Id. at 16-18.[6]

## II. APPLICABLE STANDARD OF REVIEW

In ERISA cases, when a benefits plan confers to the administrator the discretionary authority to determine benefit claims and appeals, courts will review those determinations under an "abuse of discretion" standard.  Metro. Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2348 (2008); Firestone Tire & Rubber Co v. Bruch, 489 U.S. 101 (1989).  Here, the Fund's Declaration of Trust grants the Trustees broad discretion in interpreting

---

[6] Plaintiffs also re-raise the argument that the Trustees' September 24, 2009, letter represented a waiver of a portion of the lien.  As noted above, the Court has previously rejected that argument and will not re-visit it here.

and applying the terms of the agreement.  It provides in

pertinent part,

> Any question or issue of interpretation, construction,
> application or enforcement of the terms of this Trust
> Agreement, any Participation Agreement, the said
> plan(s) of benefits, of the Fund's rules, regulations
> or instruments, including any determination on
> benefits claims and appeals, is subject to the broad
> discretion of the Board of Trustees and/or any Claims
> Review Committee of the Board of Trustees to which it
> refers such appeals, and/or to any arbitration or
> other mechanism or procedure provided for by the Board
> of Trustees for and in such plan(s), and their
> determinations are final and binding.

Ex. B at 4.  Furthermore, the subrogation agreement provides

that the Fund "retains the sole and final discretion to decide

whether and in what case" a request for reduction of a lien

should be granted.  Ex. G ¶ 2.

Pursuant to the "abuse of discretion" standard, an

administrator's decision will be upheld if it is reasonable,

even if the reviewing court would have come to a different

conclusion based on the same set of facts and policy language.

White v. Eaton Corp. Short Term Disability Plan, 308 Fed. Appx.

713, 716 (4th Cir. 2009); Bernstein v. CapitalCare, Inc., 70

F.3d 783, 787 (4th Cir. 1995).  For a decision to be reasonable,

it must follow a "full and fair review" and be "the result of a

deliberate, principled reasoning process" that is "supported by

substantial evidence."  29 U.S.C. § 1332(a); See also Stup v.

UNUM Life Ins. Co. of Am., 390 F.3d 301, 307 (4th Cir. 2004).

Courts examine the reasonableness of a decision by looking to several non-exclusive factors, including:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan, 201 F.3d 335, 342-43 (4th Cir. 2000).  Moreover, the phrase "substantial evidence" refers to evidence that "consists of less than a preponderance but more than a scintilla of relevant evidence that 'a reasoning mind would accept as sufficient to support a particular conclusion.'"  Whitley v. Hartford Life & Acc. Ins. Co., 262 Fed. Appx. 546, 551 (4th Cir. 2008) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).  Put differently, "[i]f there is evidence to justify a refusal to direct a verdict were the case before the jury, then there is 'substantial evidence.'" Celebrezze, 368 F.2d at 642.

With regard to the final element of the reasonableness test announced in Booth, a conflict of interest exists where an employer or benefit plan serves the dual role of determining eligibility for benefits and actually paying the benefits.

<u>Glenn</u>, 128 S.Ct. at 2346.  A conflict of interest, however, does

not operate to reduce the deference given to a

fiduciary's discretionary decision to deny benefits.  Rather, it

is weighed as "but one among many factors in determining the

reasonableness of the Plan's discretionary determination."

<u>Champion v. Black & Decker (U.S.) Inc.</u>, 550 F.3d 353, 359 (4th

Cir. 2008).

## III. DISCUSSION

While acknowledging that the "abuse of discretion" standard

is generally applicable in ERISA actions where the decision

maker is granted discretion, <u>see</u> Opp'n at 14, Plaintiffs appear

to argue that the Fund's failure to render a timely decision on

Ms. Costa's request to reduce the lien somehow alters that

standard.  The SPD states that upon sending an appeal to the

Claims Review Committee a claimant should be notified in writing

of the decision of the Committee within 60 days of the date the

appeal was submitted, unless there are special circumstances, in

which case the claimant should be notified of the decision

within 120 days.  Ex. C at 54.  Plaintiffs observe that

"[n]owhere does [the SPD] say that these time periods are

discretionary."  Opp'n at 17.

Assuming without deciding that the decision was not

rendered within a timely fashion, the Court is aware of no

authority for the proposition that this type of procedural

violation permits the Court to apply a different standard of review and Plaintiffs proffer no such authority. This Court has held specifically that "applying a de novo standard of review where deference is generally warranted solely because of a procedural error is an extreme measure that is inconsistent with the settled law of ERISA." DiCamillo v. Liberty Life Assurance Co., 287 F. Supp. 2d 616, 626 (D. Md. 2003). While the Fourth Circuit has not directly spoken to the issue, the Ninth Circuit has held that procedural violations do not alter the standard of review "unless the violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantial harm." Gatti v. Reliance Life Ins. Co., 415 F.3d 978, 985 (9th Cir. 2005). "When an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity. Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 972 (9th Cir. 2006) (internal quotes omitted). The Court finds that the Fund engaged in just such a good faith exchange of information and that there was no flagrant violation here that would lessen the requisite deference to the Trustees' decision.

Turning to the decision itself, the Court finds it to be reasonable and well supported by substantial evidence. As noted above, the medical records are replete with references to the January 2006 accident as the cause of the injury necessitating the treatment Ms. Costa received and for which the Fund paid. The Independent Medical Reviewer determined that the symptoms and pathology that necessitated Ms. Costa's treatment and surgery, "more likely than not," were due to the motor vehicle accident and gave compelling reasons to support that conclusion. Ex. Z. While some medical records also reference the pre-existing condition, it is always in the context of a pre-existing condition that was "exacerbated," or "flared up" because of the accident. There is nothing in the medical records to support the conclusion that, had Ms. Costa not been involved in this accident, she would nevertheless have incurred the medical bills that gave rise to the lien at issue.

Unable to point to such evidence, Plaintiffs resort to the argument that it would be inequitable for the Fund to recover such a large proportion of the funds it had no role in collecting. See Opp'n at 7-8.[7] This Court has previously

---

[7] See also Opp'n at 9 (suggesting that "[i]t is up to the trial judge to determine after reviewing all of the medical records and other damages alleged by the Plaintiff what would be the most equitable way of determining the Fund's rights to be subrogated by monies received by third parties").

embraced such an argument, only to have it rejected by the

Fourth Circuit.  In United McGill Corp. v. Stinnett, 950 F.

Supp. 134 (D. Md. 1996), an employee incurred medical bills as a

result of a motor vehicle accident which totaled $39,000 and

those bills were paid by her employer's ERISA plan.  The

employee hired counsel and brought suit against the driver who

caused the accident and ultimately settled the claim for

$100,000.  One third of that settlement, however, went to her

attorney pursuant to a contingency fee arrangement.  When the

employer (which was also the administrator of the plan) sued to

recover the full amount of the benefits it had paid, the

employee insisted that the employer reduce its lien by one third

to account for the attorney's fees expended in order to achieve

the settlement.  This Court agreed, reducing the employer's

award because it was "fair, appropriate, and equitable" for the

plan to share in the costs of obtaining the settlement.  Id. at

137.

The employer appealed that portion of this Court's ruling.

United McGill Corp. v. Stinnett, 154 F.3d 168 (4th Cir. 1998).

On appeal, the employee, like Plaintiffs in the instant action,

pointed to the "'obvious inequities' of allowing [the employer]

to benefit without contributing to the recovery" and argued that

"federal common law should not allow [the employer] to benefit

---

16

from its inaction." Id. at 171. The Fourth Circuit, after concluding that the "unambiguous language" of the employee benefit plan obligated the employee to repay the benefits paid in full, without mention of a pro rata deduction for her expenses, held that "[a]pplying federal common law to override the Plan's reimbursement provision would contravene, rather than effectuate, the underlying purpose of ERISA." Id. at 173. The Fourth Circuit then vacated this Court's judgment and remanded the action with instructions to enter judgment for the plan in the full amount of the reimbursement claimed. Id.

Unlike the instant action, in Stinnett there was a large enough settlement that the attorney's fee could be paid and there would still be enough funds remaining to fully repay the employee benefit plan. In a footnote, the Fourth Circuit indicated that it was "leav[ing] for another day" how to treat a situation where the amount of recovery from third parties after deducting attorney's fees is less than the plan's reimbursement claim. Id. at 173 n.*. That situation, however, presented itself to one of our sister courts less than a year later in Cagle v. Ford, 59 F. Supp. 2d 548 (E.D.N.C. 1999).

In Cagle, the employee benefit plan paid out $41,719.45 in claims related to a motor vehicle accident in which an employee was involved. The injured employee hired an attorney to pursue a claim against the at-fault driver of the other vehicle. As is

the case in the instant action, both the employee and the employee's attorney signed a subrogation agreement whereby they agreed to reimburse the plan in full from any recovery received. The attorney was only able to recover $25,000 for the employee's injuries, settling for the policy limits of the other driver's insurance. The employee's attorney offered the fund a payment of $18,604.27, which represented the amount of recovery less a 25% reduction for his fee plus his costs. The fund rejected that offer and filed an action seeking a declaratory judgment that it was entitled to the entire $25,000. The employee and employee's attorney protested, arguing that the fund "should be estopped from seeking reimbursement for the full $25,000" because, had the employee not retained counsel to pursue the claim, the fund would not have recovered any of the benefits paid. Id. at 553.

After noting that the clear and unambiguous language of the subrogation agreement signed by the employee and his attorney stated that they "agree to reimburse the Plan in full from the proceeds of any recovery received," the court applied the holding in Stinnett and concluded that it could not permit federal common law to override the plan's clear provisions. Id. at 555-56 (emphasis in original). The Cagle court noted that the footnote in Stinnett leaving for another day the situation where the "'recovery from the third party after deducting

attorney's fees is actually less than the plan's reimbursement claim,'" id. at 556 (quoting Stinnett at 173 n.*, emphasis added in Cagle), seemed to imply that the attorney would recover his fees at the expense of the employee. The district court in Cagle opined, however, that the Stinnett footnote envisioned a case where the attorney was not a party to the subrogation agreement. Because in the case before it the attorney was bound by the clear language of the subrogation agreement, the court concluded that he was not entitled to deduct his fee from the amount of the recovery. Id. at 156.

Here, the language in the SPD and in the subrogation agreement is equally clear and unambiguous. Plaintiffs agreed that:

> "[the Fund has the right to reimbursement from monies recovered from third parties] up to the full extent of benefits paid by the Fund;"

> "[t]he Fund is entitled to its full lien and/or its full recovery of the total amount of benefits which are payable, regardless of the amount of monies paid or awarded to you by the third party . . . and regardless of how they are described or what they are for, and regardless of whether full compensation from the third party is obtained or available;

> "[t]his provision applies to any type of payment, which in any way arises from or in connection with the . . . accident;"

> "[u]nless and until the Fund has received full reimbursement, no monies from or through a third party may be distributed to you [or] your attorney . . . without the Fund's written consent, and these monies

are, to the full extent of benefits payable or paid by
the Fund, assets of and debts owed to the Fund;" and

that "[n]o other liens may be superior to the Fund's
lien or rights under this provision."

Ex. G at ¶¶ 1, 2, 3, 9, 13; see also Ex. C at 28-30.  While the

SPD and the Subrogation Agreement provided that the Fund "may in

its discretion and in an appropriate case, agree to a reduction

of its lien for payment of a portion of attorneys' fees and

costs of a legal proceeding," Ex. G. at ¶ 13; Ex. C at 30

(emphasis added), nothing in the SPD or the subrogation

agreement required it to do so.

Accordingly, this Court finds that the Fund is entitled to

recovery of the full $82,398.12.[8]  In reaching this conclusion,

the Court recognizes that this result may appear at first glance

as somewhat unfair.  Albeit in a slightly different context, the

Fourth Circuit challenged the idea that requiring attorneys to

honor ERISA subrogation provisions is unconscionable.  Kress v.

Food Emp'rs Labor Relations Ass'n, 391 F.3d 563 (4th Cir. 2004).[9]

The court explained,

this purported unfairness is nothing more than
commonplace economic calculus.  Attorneys considering
taking a case on contingency commonly factor the

---

[8] The Court expresses no opinion as to how the remainder of the
recovery should be allotted between the Costas and Mr. Green as
that issue is not before the Court.

[9] In Kress, the issue was whether an employee benefit plan could
condition coverage on the beneficiary's attorney first signing a
subrogation agreement.

likelihood of success and the magnitude of recovery
into their decision.  Many tort claims involve
considerable risk and insufficient reward.  Attorneys,
however, carefully screen these claims and reject a
large portion, including most denominated as high
risk.  A given plan's subrogation rules obviously make
the payment of fees more or less likely, and prudent
attorneys would factor those rules into their calculus
as well.  If the participant and his attorney conclude
that private litigation will not produce a sufficient
recovery to make the litigation worthwhile, they need
not bring the case.  Often, however, an attorney might
estimate that a jury award or settlement--with
possible pain and suffering damages--will far exceed
the amount to be reimbursed to a plan.  This is the
same calculation commonly made in non-ERISA contexts,
but with one further factor to add to the equation.

391 F.3d at 570 (internal quotations and citations omitted).

Here, Mr. Green should have been well aware of the Fund's
subrogation provisions.  He signed and bound himself to the
subrogation agreement.  Furthermore and of some significance in
considering the issue of fairness, the Court notes that the Fund
offered to accept a reimbursement from the Costas of just
$41,199.06 and the Costas, presumably on the advice of Mr.
Green, rejected that offer.

Finally, the Fund has requested that the Court also award
it reasonable attorney's fees and costs, pursuant to ERISA
section 502(g)(1), 29 U.S.C. § 1132(g)(1).  Pursuant to 29
U.S.C. § 1132(g), "the court in its discretion may allow a
reasonable attorney's fee."  See Quesinberry v. Life Ins. Co. of
N. Am., 987 F.2d 1017 (4th Cir. 1993).  The Fourth Circuit has
adopted a five-factor test to guide the district court's

exercise of discretion in awarding attorney's fees under ERISA.

Quesinberry, 987 F.2d at 1028-29.  These five factors consist

of:

> (1) the degree of the opposing party's culpability or
> bad faith;
>
> (2) the ability of opposing parties to satisfy an
> award of attorney's fees;
>
> (3) whether an award of fees against the opposing
> parties would deter other persons acting under similar
> circumstances;
>
> (4) whether the parties requesting attorney's fees
> sought to benefit all participants and beneficiaries
> of an ERISA plan or to resolve a significant legal
> question regarding ERISA itself, and
>
> (5) the relative merits of the parties' positions.

See Reinking v. Philadelphia Am. Life Ins. Co., 910 F.2d 1210,

1217-18 (4th Cir. 1990).  "This five factor approach is not a

rigid test, but rather provides general guidelines for the

district court in determining whether to grant a request for

attorney's fees."  Id.  Furthermore, "even a successful party []

does not enjoy a presumption in favor of an attorneys' fees

award."  Williams v. Metropolitan Life Ins. Co., 609 F.3d 622,

634 (4th Cir. 2010).

The Court declines to award attorney's fees in this

instance.  There is no indication that Plaintiffs brought this

action in bad faith and, while the merits of their arguments are

thin, those merits are not non-existent.  Most significantly,

while the Court is not aware of the relative ability of the Costas or Mr. Green to satisfy an award of fees, the Court takes into account that the Costas have suffered injuries and damages that the underinsurance of the driver that hit Ms. Costa's vehicle rendered non-compensable and that Mr. Green has expended time on the Costa's behave for which he too will not be compensated.

## IV. CONCLUSION

For the above stated reasons, the Court determines that Defendant/Counterclaim Plaintiff's motion for summary judgment should be granted. A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: September 24, 2010.